**The PEOPLE of the State of Colorado,
Petitioner/Cross–Respondent**

v.

**Tremaine D. SPEER, Respondent/Cross–
Petitioner.**

No. 08SC333.

Supreme Court of Colorado,
En Banc.

June 27, 2011.

John W. Suthers, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Criminal Justice Section, Appellate Division Denver, Colorado, Attorneys for Petitioner/Cross–Respondent.

Douglas K. Wilson, Public Defender, Stephen C. Arvin, Deputy Public Defender, Denver, Colorado, Attorneys for Respondent/Cross–Petitioner.

Justice COATS delivered the Opinion of the Court.

Both Speer and the People petitioned for review of the court of appeals' judgment reversing Speer's conviction for attempted aggravated robbery. *See People v. Speer,* 216 P.3d 18 (Colo.App.2007). The People sought review of the court of appeals' determination that the district court erroneously denied Speer's requested jury instruction on the affirmative defense of duress, resulting in the reversal of his conviction. Speer cross-petitioned, asserting that even if this court were to disagree that denial of his requested instruction was reversible error, he would nevertheless be entitled to a new trial because the district court erred in rejecting his challenges for cause to two prospective jurors who worked in airport security.

Because there was simply no evidence from which a reasonable jury could find that the defendant acted under duress, as the statute defining that defense has been construed by this court, the district court did not err in rejecting the defendant's proffered duress instruction. Because neither the Department of Homeland Security (DHS) nor the Transportation Security Administration (TSA) is a public law enforcement agency within the meaning of subsection 16–10–103(1)(k), C.R.S. (2010), the district court also did not err in rejecting the defendant's challenges for cause to the two jurors in question. The judgment of the court of appeals is therefore reversed, and the case is remanded with directions to reinstate the judgment of conviction.

**I.**

Tremaine D. Speer was charged with attempt to commit first degree murder, first

degree assault, attempt to commit aggravated robbery, theft by receiving, possession of a weapon by a previous offender, and committing a crime of violence, all arising from an attempted robbery and shooting of the robbery victim outside a convenience store on April 6, 2004. The jury convicted Speer of attempted aggravated robbery and committing a crime of violence, but it acquitted him of both attempted murder and first degree assault.[1] He was sentenced to a term of incarceration of sixteen years.

During the jury selection process, the defense challenged two prospective jurors for cause when they indicated that they worked in airport security for the Department of Homeland Security.[2] The defendant argued that they were employees of a public law enforcement agency, as contemplated by subsection 16–10–103(1)(k) of the revised statutes. The trial court denied both challenges on the ground that security screeners, like the two prospective jurors in question, could not be considered employees of a public law enforcement agency subject to challenge for cause. Speer exercised a peremptory challenge to remove one of the prospective jurors but exhausted his remaining peremptory strikes before questioning the second juror, who therefore sat for the trial.

At trial, the prosecution presented evidence that the victim negotiated with an acquaintance named Jamar Dickey to sell his used Honda for $600. After the victim met Dickey at an automotive parts store on the evening in question and completed the vehicle transaction, Dickey agreed to drive him and his family home in the Honda. When Dickey made an unplanned stop at a convenience store and went inside, Speer emerged from behind a dumpster in the parking lot, pointed a gun at the victim, and demanded his money. As the victim hesitated, Speer shot the victim in the stomach. After a brief altercation with Speer, the victim fled on foot and collapsed less than a block from the convenience store.

Testifying on his own behalf, Speer did not dispute that he demanded the victim's money at gunpoint or that he shot the victim in the process but asserted instead that the shooting was accidental and that the robbery was part of a plot in which he participated only under duress. Speer testified that the man identified as Dickey, an acquaintance whom Speer had met through friends several months before, threatened him with a gun earlier in the day and also threatened to find and harm his brother if he declined to cooperate in the robbery. He described in considerable detail the entire day he spent with Dickey, including various times in which he was out of Dickey's presence and in control of both Dickey's gun and a car. In particular he described positioning himself to carry out the robbery by driving himself, with the weapon in his possession, to the alley behind the convenience store, while Dickey was meeting the victim at the automotive parts store to consummate the sale.

At the close of evidence Speer requested that the jury be instructed on the affirmative defense of duress. The trial court, however, denied the instruction, finding that Speer had failed to present evidence from which the jury could make the factual findings necessary to satisfy the defense.

The court of appeals reversed, concluding that sufficient evidence of the defense had been presented at trial. In its opinion, the division held that the imminence of a threat is a question for the jury in all but the clearest of cases and that Dickey's threats to harm Speer's brother, if believed by the jury, were sufficient to support a finding that he lacked any reasonable opportunity to escape. *See Speer*, 216 P.3d at 24. The court of appeals, however, rejected Speer's argument that the district court erred in declining to sustain his challenges for cause to prospective jurors working as airport security screeners. *See id.* at 25–26.

We granted the People's petition for a writ of certiorari challenging the court of appeals' reversal for rejecting the defendant's pro-

---

1. On the remaining counts, Speer pled guilty pretrial to theft by receiving and the prosecution dismissed the count for possession of a weapon by a previous offender.

2. One of the prospective jurors stated she worked for both DHS and TSA. TSA is currently a division within DHS. *See Francis v. Mineta,* 505 F.3d 266, 268 n. 2 (3d Cir.2007).

posed duress instruction, as well as Speer's cross petition challenging the decision to permit airport security personnel to sit.

## II.

It is too well settled to merit further discussion that a trial court is obliged to instruct the jury on a requested affirmative defense if there is any credible evidence, including even highly improbable testimony of the defendant himself, supporting it. *See, e.g., Lybarger v. People,* 807 P.2d 570, 579 (Colo.1991). To place the defense in issue, however, there must be some credible evidence to satisfy each of its components or constituent elements. *Id.* And whether there is credible evidence to support each element of an affirmative defense is a question for the court rather than the jury. *Id.* Similarly, the construction of a statute defining an affirmative defense, and consequently the determination of the precise elements of that defense, is a question of law for the court. *See People v. Garcia,* 113 P.3d 775, 780 (Colo. 2005).

This jurisdiction has long codified some version of the related common law defenses of duress and necessity. *See* §§ 18–1–702, –708, C.R.S. (2010); C.R.S.1963, §§ 40–1–802, –808 (1971 Perm. Cum. Supp.); *see also United States v. Bailey,* 444 U.S. 394, 410, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (discussing the common law defenses and some of their more modern variations and codifications). Our current statutory defense of duress bars the conviction of a person for any criminal offense, other than a class 1 felony, "based upon conduct in which he engaged at the direction of another person because of the use or threatened use of unlawful force upon him or upon another person, which force or threatened use thereof a reasonable person in his situation would have been unable to resist." § 18–1–708. While this statute no longer expressly limits the applicability of the defense to threats of death or serious bodily injury, neither does it expand the defense so far as to include every threat causing subjective fear or exculpate every defendant too weak to resist threats against himself or another. *See Bailey v. People,* 630 P.2d 1062, 1068–69 (Colo.1981);

*see also People v. Preciado–Flores,* 66 P.3d 155, 163 (Colo.App.2002) (fear must be "well-grounded"); *cf. People v. Robertson,* 36 Colo.App. 367, 369, 543 P.2d 533, 535 (1975). The statute retains an objective standard of reasonableness, exculpating only for threats that a reasonable person would not have been able to resist.

Defenses of necessity, whether occurring in more generic forms like choice of evils or duress, or more specific incarnations like defense of person, property, or premises, have never been available as alternatives to relying on the protection of the law. *See generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.1(a), at 7 (2d ed. 2003) (stating that justification defenses generally are unavailable where there is "some opportunity to seek less drastic means of avoiding that harm"). In characterizing the common law defenses of duress and necessity in particular, the United States Supreme Court has noted that "[u]nder any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail." *Bailey,* 444 U.S. at 410, 100 S.Ct. 624 (quoting Wayne R. LaFave & Austin W. Scott, *Handbook on Criminal Law* § 49, at 379 (1972)).

We have consistently construed our own statute, with its requirement that the threatened force exceed any objectively reasonable ability to resist, as making the defense of duress, like the closely related defense of necessity or choice of evils, unavailable in the absence of a specific and imminent threat of injury under circumstances leaving the defendant no reasonable alternative other than to violate the law for which he stands charged. *See Bailey,* 630 P.2d at 1068; *People v. Handy,* 198 Colo. 556, 559, 603 P.2d 941, 943 (1979); *accord People v. Trujillo,* 41 Colo.App. 223, 225, 586 P.2d 235, 237 (1978); *Robertson,* 36 Colo.App. at 369, 543 P.2d at 535; *cf. People v. Strock,* 623 P.2d 42, 44 (Colo.1981) (choice of evils). And in a variety of settings, we have found it proper for courts to deny an instruction on one or the other of these related defenses based on the

existence of undisputed evidence of reasonable legal alternatives. *See, e.g., People v. Smith,* 754 P.2d 1168, 1170 (Colo.1988) (rejecting self-defense instruction where defendant's act of shooting victim's car not reasonably "necessary to defend himself"); *Handy,* 198 Colo. at 559–60, 603 P.2d at 943 (rejecting choice-of-evils instruction where escaped prisoner failed to report once imminent threat had dissipated); *accord People v. Laurson,* 15 P.3d 791, 795 (Colo.App.2000) (rejecting self-defense instruction where victims were already fleeing); *People v. Suazo,* 867 P.2d 161, 169 (Colo.App.1993) (rejecting defense-of-others instruction where victim had already left fracas to seek medical attention).

■ Taking all of Speer's testimony as true, the record was nevertheless devoid of any evidence to support a finding that Dickey's threats were sufficiently imminent to strip him of any reasonable legal alternative to committing robbery at gunpoint and, as it turned out, shooting and seriously wounding the victim. By Speer's own account, he and Dickey spent the day together after Dickey's initial threats, at various points during which Speer was either in sole possession of Dickey's gun or completely out of Dickey's presence. Most particularly, Speer testified that he was left in control of both a vehicle and Dickey's gun while Dickey consummated the purchase of the victim's Honda at the auto parts store, and that while the sale was occurring, he chose to drive to the scene of the robbery and lie in wait for Dickey and the victim, rather than flee and report Dickey's threats and intentions to the police. *See United States v. Johnson,* 416 F.3d 464, 466, 468–69 (6th Cir.2005) (upholding refusal to submit duress instruction where accomplice voluntarily handed defendant his only weapon to enable defendant to commit planned crime); *State v. Charlton,* 338 N.W.2d 26, 31 (Minn.1983) (duress defense adequately disproved where defendant had opportunity to take possession of gun from alleged threatening accomplice but failed to do so).

Notwithstanding these opportunities to seek police protection and foil the robbery plot, the court of appeals felt that Speer's otherwise criminal conduct could nevertheless be justified by Dickey's threats against Speer's brother. But unlike a hostage situation or other circumstance of immediate danger to someone else, there was no suggestion that Speer's brother was at any time under the control of either Dickey or an accomplice. Speer testified only that he feared Dickey would later find and hurt him or his brother unless he assisted with the robbery. It was not for the jury to decide whether the defendant was justified in not placing his faith in the legal system once he had a clear opportunity to do so. *See People v. Brandyberry,* 812 P.2d 674, 679 (Colo.App.1991) (disapproving choice-of-evils instruction where defendants failed to seek assistance of law enforcement officials after abducting victim from cult).

Unless a jury were presented with evidence from which it could find that given the imminence of the threat, violation of the law was the defendant's only reasonable alternative, he could not be entitled to a duress instruction. Where, as here, the defendant's own account alleges only threats of remote or future injury, made under circumstances revealing present opportunities to notify law enforcement and seek their protection without immediate risk to himself or his brother, the defense of duress was unavailable as a matter of law. The district court therefore properly denied the requested instruction.

### III.

■ By both statute and rule, a criminal trial court is obligated to sustain a challenge for cause to any prospective juror who is a compensated employee of a public law enforcement agency.[3] *See* § 16–10–103(1)(k); Crim. P. 24(b)(1)(XII) (similar language but without expressly requiring compensation). On their face, the statute and rule express concern for the nature of the employing agency rather than the specific duties of the venireman in question, and therefore the fact

---

**3.** Subsection 16–10–103(1)(k) states, "The court shall sustain a challenge for cause on one or more of the following grounds: ... (k) The juror is a compensated employee of a public law enforcement agency or a public defender's office."

that the job description of any particular venireman may not directly involve law enforcement functions is not dispositive of his ability to sit. *See People v. Coleman,* 844 P.2d 1215, 1218 (Colo.App.1992); *People v. Manners,* 708 P.2d 1391, 1392 (Colo.App. 1985); *People v. Maes,* 43 Colo.App. 365, 367, 609 P.2d 1105, 1107 (1979); *People v. Scott,* 41 Colo.App. 66, 68, 583 P.2d 939, 941–42 (1978). By the same token, however, a prospective juror's governmental employer does not become a public law enforcement agency solely because the prospective juror in question, or any other of his co-employees for that matter, performs law enforcement functions. *See Ma v. People,* 121 P.3d 205, 211 (Colo.2005) (Department of Defense not a public law enforcement agency despite overseeing the Army Military Police Corps); *see also People v. Simon,* 100 P.3d 487, 491 (Colo.App.2004) (Environmental Protection Agency not a public law enforcement agency despite having incidental penal law enforcement authority).

As we have noted elsewhere, the revised statutes themselves identify a number of public offices as law enforcement agencies, including, for example, any police department, sheriff's department, or district attorney's office; the office of the state attorney general; the Colorado bureau of investigations; and the Colorado state patrol. *See Ma,* 121 P.3d at 211. Using these designated governmental bodies as examples or prototypes, we have inferred that the legislature intended to include within the category of public law enforcement agency only agencies enforcing the criminal law, and we have interpreted the statutory designation to include not only those agencies specifically identified but also other agencies performing similar functions. *See, e.g., id.* at 211–12 (including Army Military Police Corps). We have not, however, expanded the rubric of law enforcement agency to the extent of including any division of government whose primary purpose or mission is not the enforcement of the criminal law. *E.g., id.*

In the absence of an express statutory definition of the term "agency," we have interpreted it flexibly, in accordance with common usage. *See id.* at 210. In *Ma,* we

explained that the term "agency" is not confined by bureaucratic happenstance and should not be interpreted rigidly so as to undermine the rationale behind the statute's rule requiring automatic disqualification. *Id.* at 212 (construing "agency" to include a "branch" of the Army). We there made no attempt to limit the applicability of the term in any formal way to governmental bodies of a certain level or with specific authority concerning ultimate employment determinations. Quite the contrary, we made clear in *Ma* that an "agency" for purposes of the statute may be either a division of government or some smaller subdivision of a larger governmental agency. *Id.*

██ As a result, even though the primary function or purpose of a broader governmental organization, department, division, or agency may not be appropriately characterized as the enforcement of the criminal law, law enforcement may nevertheless be the primary function or purpose of some smaller unit or subdivision of that governmental organization. It may therefore be, and typically is, the case that although a governmental department or agency is not a public law enforcement agency within the contemplation of the statute and rule, a narrower unit or subdivision of that department is. In that event, although all of the employees of the broader governmental department are not subject to challenge for cause, those of its employees serving in a qualifying subdivision are subject to removal on the basis of their employment.

██ Finally, unless a public agency has already been identified as a public law enforcement agency by statute or the published case law of the jurisdiction, a trial court cannot be expected to divine its nature as a law enforcement agency without having its primary function or purpose brought to the attention of the court. It is therefore incumbent upon any party asserting a challenge for cause under this subsection of the statute not only to make timely objection but to provide the court, through examination of the prospective juror or request for judicial notice, with adequate evidence of the nature of the employing unit in question. *Cf. People v. Topping,* 764 P.2d 369, 370 (Colo.App.1988)

(holding State Department Administration not a public law enforcement agency because "[t]here was no evidence" in record to that effect).

■ By these standards, there can be no doubt that neither the Department of Homeland Security nor the Transportation Safety Administration is a public law enforcement agency within the contemplation of the statute. Neither agency has as its predominant purpose or mission the enforcement of penal laws. Rather, both agencies are statutorily organized and authorized to protect national security. See 6 U.S.C. § 111(b)(1) ("The primary mission of [DHS] is to ... prevent terrorist attacks within the United States...."); 49 U.S.C. § 114(d) (TSA Under Secretary responsible for "security in all modes of transportation"). Such security functions do not involve the traditional law enforcement functions we identified in Ma, like the investigation of crime, or the arrest, prosecution or detention of criminal suspects. See 6 U.S.C. § 111(b)(2) ("[P]rimary responsibility for investigating and prosecuting acts of terrorism shall be vested not in [DHS], but rather in Federal, State, and local law enforcement agencies with jurisdiction over the acts in question.").

■ Nor did anything before the district court suggest that the airport security screeners in question served in a unit or subdivision of the Administration with traditional law enforcement authority. In response to questioning by the court, both of the prospective jurors denied having any authority to detain or make arrests. One indicated that if an arrest were required, the Denver Police Department would be called, and the other made clear her belief that her position as an airport screener did not involve any formal relationship with a law enforcement agency. Neither juror gave the slightest indication that their employing unit prosecuted suspected criminals, and Speer asked no follow-up questions.

Even if special units within the Department or Administration, like the Office of the Inspector General and Federal Air Marshals, having authority to carry firearms, make arrests, and seek and execute warrants, see 5 U.S.C. app. 3, § 6(e)(1)(A)-(C);

49 U.S.C. §§ 44903(d), 44917, could be appropriately characterized as public law enforcement agencies, their status would not affect the classification of the broader agencies of which they are sub-divisions or sub-agencies. Just as our characterization of the Military Police Corps as a law enforcement agency did not require similar characterization of the United States Army or the Department of Defense, see Ma, 121 P.3d at 211–12, so too the characterization of, for instance, the Department's Office of the Inspector General as a law enforcement agency would not lead to a similar characterization of the entire Department or Transportation Safety Administration.

## IV.

Because there was no evidence of the statutory defense of duress as construed by this court, and because neither DHS nor TSA is a public law enforcement agency for purposes of subsection 16–10–103(1)(k), the judgment of the court of appeals is reversed, and the case is remanded with directions to reinstate the judgment of conviction.

Justice MÁRQUEZ dissents, and Chief Justice BENDER and Justice MARTINEZ join in the dissent.

Justice MÁRQUEZ, dissenting.

I respectfully dissent because I believe this court has erroneously imported elements of the choice of evils defense into the defense of duress, conflating the two, contrary to the plain language of section 18–1–708, C.R.S. (2010). In addition, I disagree with the majority's characterization of the record that there was "simply no evidence" from which a reasonable jury could find that the defendant acted under duress. In my view, Speer was entitled to a jury instruction on the defense of duress because he presented the requisite "scintilla" of evidence that he acted under a "threatened use of unlawful force" against him and his brother that "a reasonable person in his situation would have been unable to resist." § 18–1–708; People v. Saavedra–Rodriguez, 971 P.2d 223, 228 (Colo.1998). Thus, I would affirm the court of appeals' ruling that the trial court's erroneous refusal

to give the defendant's proffered duress instruction requires us to reverse the conviction and remand for a new trial. Because I would affirm the judgment of the court of appeals on that ground, I would not reach the defendant's arguments regarding his challenges for cause to two prospective jurors who worked in airport security.

## I.

The majority holds that a defendant is not entitled to a duress instruction unless the jury is "presented with evidence from which it could find that given the imminence of the threat, violation of the law was the defendant's only reasonable alternative." Maj. op. at 1120. The majority concludes that the defense of duress is unavailable as a matter of law where the defendant "alleges only threats of remote or future injury, made under circumstances revealing present opportunities to notify law enforcement and seek their protection without immediate risk to himself or his brother." *Id.*

This court has imported both "imminence" and "no reasonable alternative" requirements into the statutory defense of duress, even though these requirements appear nowhere in section 18–1–708. In my view, this error stems from a conflation in our case law of the defenses of duress and choice of evils. This case represents the first time that this court has declared the two requirements to be necessary elements of the defense of duress since the legislature disentangled duress from choice of evils through a 1988 amendment to the duress statute. Unfortunately, despite the legislative amendment distinguishing duress from choice of evils, the majority continues unnecessarily to conflate the two defenses, contrary to the statutory language.

As an initial matter, *People v. Garcia,* 113 P.3d 775, 780 (Colo.2005), cited by the majority, construed a statutory affirmative defense as a matter of law, but in no way supports the majority's proposition that "the determination of the precise elements" of an affirmative defense is a question for the court. Maj. op. at 1119. Rather, courts construe the elements of a statutory defense, but do not create them.

As we have recently observed, the provisions of the criminal code and other Colorado statutes govern "'the construction and application of any defense to a prosecution for such an offense.'" *Oram v. People,* 255 P.3d 1032, 1036 (Colo. May 16, 2011) (quoting § 18–1–103(1), C.R.S. (2010)). The legislature has abolished not only common law offenses, but also common law defenses. *Id.*; § 18–1–103(1); § 18–1–104(3), C.R.S. (2010). Thus, affirmative defenses in ·Colorado are defined by the General Assembly in the Colorado Revised Statutes. *Oram,* 255 P.3d at 1036.

Here, the majority holds that, to be entitled to a jury instruction on the defense of duress, a defendant must present evidence of both the "imminence" of the threat, as well as evidence that the defendant had no "reasonable alternative" available to committing the crime. The majority's articulation of these elements of duress finds no support in the General Assembly's codification of the defense in section 18–1–708.

Colorado's duress statute provides:

A person may not be convicted of an offense, other than a class 1 felony, based upon conduct in which he engaged at the direction of another person because of the *use or threatened use of unlawful force upon him or upon another person, which force or threatened use thereof a reasonable person in his situation would have been unable to resist.* This defense is not available when a person intentionally or recklessly places himself in a situation in which it is foreseeable that he will be subjected to such force or threatened use thereof. *The choice of evils defense, provided in section 18–1–702, shall not be available to a defendant* in addition to the defense of duress provided under this section *unless separate facts exist which warrant its application.*

§ 18–1–708 (emphasis added). The pattern jury instruction follows these statutory elements, *see* CJI–Crim. 7:09, as did Speer's proffered jury instruction in this case.

Colorado's duress statute contains no mention of "imminence," or the unavailability of "reasonable alternatives." In my view, this

court has erroneously imported these elements from the related, yet distinct affirmative defense of choice of evils.

Although "[m]odern cases have tended to blur the distinction between duress and necessity," under common law, the defense of necessity, or choice of evils, traditionally concerned physical forces beyond the actor's control that rendered the actor's conduct the lesser of two evils, whereas the defense of duress arose where coercion had its source in the actions of other human beings. *See United States v. Bailey*, 444 U.S. 394, 409, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980).

The requirements of "imminence" and the unavailability of any "reasonable legal alternative" make logical sense in the context of choice of evils because the choice of evils defense "is based on a real emergency involving specific and imminent grave injury that presents the defendant with no alternatives other than the one taken." *Andrews v. People*, 800 P.2d 607, 609 (Colo.1990). Indeed, as now codified in the Colorado criminal code, the "choice of evils" defense is available only when the defendant's conduct "*is necessary as an emergency* measure to avoid an *imminent* public or private injury which is about to occur." § 18–1–702, C.R.S. (2010) (emphasis added).

Although "imminence" was an element of duress at common law, the General Assembly chose not to include this requirement when it codified the defense of duress in 1971.[1] *Compare Ryan v. People*, 60 Colo. 425, 430, 153 P. 756 (1915) *with* § 18–1–708. Similarly, the unavailability of any "reasonable alternative" appears nowhere in section 18–1–708. Rather, these requirements appear to have been imported into the statute by this court's conflation of the defenses of choice of evils with duress.

In my view, this conflation occurred in *Bailey v. People*, 630 P.2d 1062 (Colo.1981), the most recent case from this court relied on by the majority for its articulation of the defense of duress. Unlike the case before us, *Bailey* did not involve a jury trial or the evidence necessary to warrant a duress instruction, and thus did not concern the gatekeeping function of the trial court. Rather, in *Bailey*, this court reviewed and upheld the defendants' convictions on charges of sale and conspiracy to sell narcotics following a bench trial, concluding that the record supported the trial court's rejection of the defendants' defenses of entrapment and duress. There, we stated:

> The defense of duress is unavailable unless a defendant shows a specific and *imminent* threat of injury to his person under circumstances which leave him *no reasonable alternative* other than the violation of the law for which he stands charged; mere speculation that injury may occur is not sufficient.

*Id.* at 1068–69 (emphasis added).

We cited the court of appeals' decision in *People v. Trujillo*, 41 Colo.App. 223, 586 P.2d 235 (1978), for this articulation of the defense of duress. *Trujillo*, in turn, was quoting *People v. Robertson*, 36 Colo.App. 367, 543 P.2d 533 (1975), an earlier *choice of evils* case from the court of appeals. There, the court of appeals held:

> For [choice of evils] to be available here, it must first be shown that defendant's conduct was necessitated by a specific and imminent threat of injury to his person under circumstances which left him no reasonable and viable alternative other than the violation of the law for which he stands charged.
>
> . . .

---

1. The absence of an imminence requirement in the duress statute is noteworthy, considering that the legislature expressly requires a threat to be "imminent" for other affirmative defenses. *See, e.g.*, §§ 18–1–702(1), C.R.S. (2010) (choice of evils defense justifies use of physical force "when it is necessary as an emergency measure to avoid an *imminent* public or private injury which is about to occur"); 18–1–704(1), C.R.S. (2010) (self defense justifies use of physical force to

defend oneself or a third person from "the use or *imminent* use of unlawful physical force" by another person); 18–1–707(2)(a), C.R.S. (2010) (peace officer is justified in using deadly physical force to defend himself or a third person from the "use or *imminent* use of deadly physical force"); 18–1–707(7), C.R.S. (2010) (private person is justified in using deadly physical force to defend himself or a third person from the "use or *imminent* use of deadly physical force").

Put simply, the threat to defendant's person must be so definite, specific, and imminent as to rise beyond mere speculation. *Id.* at 534–35. Through its citation of *Trujillo*, this court essentially imported, without explanation, the requirements of the choice of evils defense into the defense of duress. Yet, shortly before *Bailey* was decided, this court twice relied directly on the identical passage in *Robertson, not* for duress, but as an articulation of the *choice of evils* defense. *See People v. McKnight,* 626 P.2d 678, 681 (Colo.1981); *People v. Strock,* 623 P.2d 42, 44 (Colo.1981).

In 1988, the General Assembly amended the duress statute, adding the sentence, "The choice of evils defense, provided in section 18–1–702, shall not be available to a defendant in addition to the defense of duress provided under this section unless separate facts exist which warrant its application." Ch. 124, sec. 15, § 18–1–702, 1988 Colo. Sess. Laws 712. Separating the two statutes in this sense should have led to the disentangling in our case law of the elements of these distinct defenses. Since that amendment, this court has not held that the statutory affirmative defense of duress requires a defendant to present evidence of "imminence" or the unavailability of any "reasonable alternative"—until today.

Given that *Bailey* involved the review of a conviction following a bench trial (and thus a different standard of review than applies to the denial of a requested jury instruction), and given the 1988 amendment to the duress statute, I would take this opportunity to realign our articulation of the requirements of duress to conform to the plain language of section 18–1–708. The majority's approach continues unnecessarily to blur the line between the courts and the legislature by importing elements into the defense of duress that find no basis in the language of the statute. *See Shelter Mut. Ins. Co. v. Mid-Century Ins. Co.,* 246 P.3d 651, 661 (Colo. 2011) ("We will not judicially legislate by reading a statute to accomplish something the plain language does not suggest, warrant or mandate.") (quoting *Scoggins v. Unigard Ins. Co.,* 869 P.2d 202, 205 (Colo.1994)); *Jones v. People,* 155 Colo. 148, 154, 393 P.2d

366 (1964) (This court is "without power to change the law" enacted by the legislature.).

The operative language of section 18–1–708 is that the threat of unlawful force be one that "a reasonable person in [the defendant's] situation would have been unable to resist." The imminence of the threat and the availability of reasonable alternatives may be factors for the jury to consider in determining whether a reasonable person in the defendant's situation "would have been unable to resist" the threat, but nothing in the legislature's codification of the defense requires a defendant to establish imminence or the unavailability of reasonable alternatives before he is entitled to a jury instruction on duress.

## II.

I further disagree with the majority's conclusion that there was "simply no evidence" from which a reasonable jury could find that the defendant acted under duress. In my view, Speer's testimony provided the requisite "scintilla" of evidence to warrant a duress instruction.

We have long held that to be entitled to an instruction on a theory of defense or an affirmative defense, a defendant need present merely a "scintilla of evidence," alternatively stated as "some credible evidence" or "any credible evidence." *Saavedra–Rodriguez,* 971 P.2d at 228; *Lybarger v. People,* 807 P.2d 570, 579 (Colo.1991); *see also* § 18–1–407(1), C.R.S. (2010) (to raise an affirmative defense, a defendant must present "some credible evidence" on the issue). Even the highly improbable, self-serving testimony of the defendant is sufficient to establish entitlement to a duress instruction if the testimony establishes some basis for each element of the defense. *See Lybarger,* 807 P.2d at 579. In considering whether a defendant is entitled to a requested instruction, we consider the evidence in the light most favorable to the defendant. *Cassels v. People,* 92 P.3d 951, 955 (Colo.2004).

According to Speer, an acquaintance named Jamar Dickey threatened to kill or violently hurt him and his fifteen-year-old brother if Speer did not rob a third party to retrieve money that Dickey paid in a sham

car purchase. Speer testified, "[Dickey] told me that if I didn't do it or somehow it got messed up, that he would violently hurt me," and "he told me that he'll kill my little brother too."

Speer testified that Dickey planned the robbery and that Dickey held a gun while he informed Speer of the plan; Dickey told Speer that Speer had no choice. Speer also testified that the "only reason" he performed the robbery was his fear of Dickey and that he never would have been in that position but for the threats.

Based on his experience, Speer had reason to believe that Dickey's threats were credible. Speer testified that Dickey had threatened him at gunpoint before; when Speer confronted Dickey about the sexual assault of a woman whom Speer had asked Dickey to look after, Dickey pointed a gun at Speer and "told me if I'm tripping over a female, then he'll kill me over a female." Speer testified that Dickey was so dangerous that even Dickey's incarceration or a restraining order could not protect Speer. Additionally, Speer said he had personal knowledge that Dickey had assaulted other people in the past.

Dickey provided the gun and car for Speer to use in the robbery. Speer testified that, despite having a gun, he was in continual fear of Dickey while in his presence. Even during the brief periods when Dickey was out of Speer's presence, Speer felt Dickey's threat to his brother did not abate: according to Speer, Dickey knew where Speer's little brother lived and Speer did not have a telephone to warn his brother. Speer testified that, if at any point he were to abandon Dickey's plan, Dickey could hurt or kill Speer or his brother "at any time."

On cross-examination, the People repeatedly asked Speer why he did not abandon Dickey's plan at certain junctures. Each time, Speer testified that he did not feel that he could. At least seven times, in reference to different points throughout the execution of the plan, Speer testified, "I didn't think I could" or "I felt I couldn't" abandon the plot given Dickey's threats.

Speer's testimony also indicated that his fear of Dickey continued after the completion of the failed robbery: he was afraid to tell Dickey he did not retrieve Dickey's money from the victim; he testified that he cried during police questioning and lied to law enforcement about knowing Dickey even as he was told by the detective that "everybody knows Jamar" and that Speer was going to spend the rest of his life in prison.

Viewed in the light most favorable to the defendant, *Cassels*, 92 P.3d at 955, I believe the record establishes that Speer's testimony presented at least a "scintilla" of evidence that a jury could reasonably believe there was a credible threat to Speer's safety and his little brother's life, and that a reasonable person in Speer's situation would have been unable to resist Dickey's orders. Ultimately, it is the jury's role to accept or reject the defense, but on this record, Speer was at least entitled to the instruction. As noted by the court of appeals, Speer's acquittal of attempted murder and first degree assault suggests that the jury found his testimony credible in part. *People v. Speer*, 216 P.3d 18, 24 (Colo.App.2007). Had the jury been instructed on the defense of duress and believed Speer's testimony, the other verdicts might also have been different. Accordingly, I respectfully dissent.

I am authorized to state that Chief Justice BENDER and Justice MARTINEZ join in this dissent.

